NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250450-U

NO. 4-25-0450

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 25, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 23JA204 |
| v. | ) | |
| Cassandra S., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held:*     The appellate court affirmed the trial court's termination of respondent's parental
rights because the court's fitness and best interest findings were not against the
manifest weight of the evidence.

¶ 2     Respondent, Cassandra S., is the mother of L.S. (born February 2018). (We note
that the father of L.S. is not a party to this appeal.) In May 2025, the trial court found respondent
was an unfit parent under the Adoption Act (Act) (see 750 ILCS 50/1(D)(b), (m)(i), (m)(ii)
(West 2024)) and that termination of respondent's parental rights would be in the minor's best
interest.

¶ 3     Respondent appeals, arguing that the trial court's (1) fitness and (2) best interest
findings were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                          I. BACKGROUND

¶ 5                                          A. Procedural History

¶ 6 In October 2023, the State filed a petition for adjudication of wardship, alleging L.S. was neglected in that (1) his mother and father failed to make a proper care plan (705 ILCS 405/2-3(1)(a) (West 2022)) and (2) his environment was injurious to his welfare due to his mother's and father's drug use (*id.* § 2-3(1)(b)).

¶ 7 That same month, the trial court conducted a shelter care hearing and placed temporary custody and guardianship of L.S. with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 8 In December 2023, the trial court adjudicated L.S. a neglected minor due to his being "left overnight with no care plan after [his] mother was arrested."

¶ 9 In January 2024, the trial court conducted a dispositional hearing, at which it entered a written order finding respondent "unfit, unable or unwilling" for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline L.S. The court also (1) adjudicated L.S. a ward of the court, (2) placed guardianship and custody of L.S. with the guardianship administrator of DCFS, and (3) admonished respondent that she "must cooperate with DCFS, comply with the terms of the service plan, and correct conditions that require [L.S] to be in care, or risk termination of [her] parental rights." Specifically, the court ordered that respondent must "cooperate with and show progress in recommended services, including substance abuse treatment, mental health services and parenting."

¶ 10 B. The Termination Hearing

¶ 11 In October 2024, the State filed a motion for termination of parental rights, alleging that respondent was an unfit parent because she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to L.S.'s welfare (750 ILCS 50/1(D)(b) (West 2024)), (2) failed to make reasonable efforts to correct the conditions that were the basis for the

removal of L.S. from her care within the nine-month period of December 27, 2023 through September 27, 2024 (*id.* § 1(D)(m)(i)); and (3) failed to make reasonable progress toward the return of L.S. to her care during the same nine-month period (*id.* § 1(D)(m)(ii)).

¶ 12                                    1. *The Fitness Proceedings*

¶ 13          In May 2025, the trial court conducted the fitness portion of the termination proceedings. At the State's request, the court took judicial notice of the adjudicatory and dispositional orders.

¶ 14                                    a. Martha Fore

¶ 15          The State called Martha Fore, who testified that she was employed by Family Service Center as a foster care supervisor and was the supervisor over L.S.'s case since it began in October 2023. She testified that L.S. was taken into care when respondent "was pulled over by the police in a stolen U-Haul and had narcotics [and her other child, K.S.,] in the car."

¶ 16          Fore approved all of respondent's service plans in this case. The first plan, which was created in November 2023, required respondent to complete substance abuse treatment, mental health counseling, and parenting services, as well as cooperate with the agency, maintain housing and employment, and attend visits. Fore discussed with respondent the services that she was required to do; respondent initially said she was willing to complete services.

¶ 17          Respondent's first case review occurred in April 2024. At that time, respondent was not rated satisfactory as to any of her services. Fore specified that respondent (1) did not have stable housing or employment, (2) was "minimally" cooperative with the caseworker, (3) had not engaged at all in mental health services, (4) had attended "a few" parenting classes, and (5) was attending two hours of weekly supervised visits, but they were on a "call and confirm" basis because she had missed several visits.

¶ 18    Regarding substance abuse treatment and random drug tests, Fore testified that respondent completed a substance abuse assessment at Family Guidance Center in March 2024, which recommended that respondent complete outpatient treatment. At the time, respondent was a patient at MedMark, a methadone clinic that provided methadone and medication management but not substance abuse treatment. Family Guidance Center could provide outpatient treatment for respondent only if she discontinued her care at MedMark and became a patient at Family Guidance Center, which would continue to provide her the methadone she was receiving through MedMark. Fore explained that MedMark was not a DCFS-approved treatment provider. However, respondent elected to continue with MedMark. Fore testified that respondent did not complete any services through Family Guidance Center and "[n]othing was documented" regarding her participating in any substance abuse treatment program.

¶ 19    Fore also testified that respondent was requested to complete 13 or 14 drug screens during the first review period, but she completed only one, which occurred in January 2024 and was positive for fentanyl, heroin, methamphetamine, amphetamine, and methadone.

¶ 20    Fore testified that the first nine-month period alleged in the petition ended on September 27, 2024, and at that time, respondent was still rated "unsatisfactory" on all her services. Darcy Garrett took over as the caseworker in August 2024.

¶ 21    On cross-examination by respondent's attorney, Fore testified that respondent eventually completed all of her parenting classes but did not pass the final test. Fore also testified that, other than one incident in January or February 2024 during which respondent was using a cell phone in violation of the visitation rules, respondent displayed appropriate parenting skills when she attended visits. Fore also testified that in August 2024, respondent had participated in "some" mental health sessions.

¶ 22    Regarding drug tests, Fore testified that she was aware respondent completed monthly drug tests at MedMark but noted that those tests were scheduled, not random.

¶ 23    Regarding housing, Fore testified that at the beginning of the case, the caseworker "went over to try to attempt to locate her because we hadn't been in communication since the case opening until like December or January." Fore said she advised the caseworker not to go to the home because there were "multiple signs outside the home of 'if you attempt to come to this home, you'll see Jesus with a gun,' or some other type of threatening signs."

¶ 24    Regarding employment, Fore testified that there were a "few periods of time where [respondent] reported she was employed, but we never received verification of anything."

¶ 25    During cross-examination by the guardian *ad litem* (GAL), Fore testified that in April 2024, respondent was rated unsatisfactory as to all services, including housing, because "[i]t couldn't be assessed due to safety issues with mother with the things that were posted around her home." (We note that Fore later clarified that respondent was rated satisfactory as to her participation in visits.) Fore said she discussed this issue with respondent but could not remember when that conversation occurred. The GAL asked more questions about respondent's substance abuse treatment, and Fore explained that, at MedMark, respondent received only prescribed methadone, not outpatient treatment services. Fore also testified that she believed respondent was uncooperative "for a large majority of the time," explaining as follows:

> "She wouldn't communicate with the caseworker. She refused to attend drops. She was not going to an approved substance abuse treatment provider. She had not completed—she had completed parenting, the classes, but she didn't go and take the test. We talked to her about doing that. So, that wasn't successfully done."

¶ 26          Fore clarified that respondent simply never took the parenting test, even though in August 2024, she told Fore that she was going to take it the next day. Respondent never took the test, and Fore did not know why.

¶ 27                            b. Darcy Garrett

¶ 28          Darcy Garrett testified that she was employed as a caseworker at Family Service Center and was L.S.'s caseworker from August 2024 to the present. When Garrett took over, respondent had not completed any services, although "she was close to completing parenting at that time." At an October 8, 2024, child and family team meeting, Garrett spoke to respondent about what services she still needed to do. At that meeting, respondent told Garrett she was "engaged in all of her services, stated that she was working, going to counseling and parenting, attending mental health counseling and receiving Methadone from MedMark."

¶ 29          Also in October 2024, Garrett rated respondent's service plan. Respondent was rated as satisfactory as to visitation, but all other services were unsatisfactory. Regarding housing, respondent reported that she was staying in another home with another roommate but gave only a street name, with no specific address. Regarding employment, respondent reported that she was employed but did not provide any pay stubs for verification. Garrett testified that "[c]ommunication was minimal."

¶ 30          Regarding mental health counseling, Garrett reached out to Northeast Family Services and learned that respondent's assigned counselor had left that agency and respondent was scheduled to see a new counselor. Garrett spoke with that counselor and requested progress reports and attendance updates, but Garrett never received any from that provider.

¶ 31          Regarding parenting, respondent "participated in 14 out of the 16 classes and was then given instructions to complete the written test, which was not done in time, so she was

unsuccessfully discharged from parenting services in October 2024."

¶ 32       Regarding substance abuse, respondent completed an assessment at Family Guidance Center on October 11, 2024. The service provider reported to Garrett that respondent was scheduled to return on October 17, 2024, for her "treatment planning appointment," but respondent did not attend and was unsuccessfully discharged.

¶ 33       Garrett also testified that she requested that respondent complete 22 drops while Garrett was the caseworker, and respondent attended only one, which was a hair follicle test. Respondent left the appointment without submitting a hair follicle. Garrett also stated that she had concerns at the October 2024 child and family team meeting that respondent might be under the influence of some substances. She completed an oral toxicology screen at that meeting, which was positive for methadone, and "the line on the Amphetamine/Methamphetamine was very, very faint, so it was considered positive."

¶ 34       Regarding visitation, Garrett stated that respondent had two hours of supervised visitation at the agency office. Visitation never progressed to longer or unsupervised visits. Garrett testified that there was never a time that she was close to being able to return L.S. to respondent.

¶ 35       On cross-examination by respondent's attorney, Garrett testified that prior to respondent's mental health counselor leaving the agency, respondent had attended only "a couple" of her appointments and had missed and canceled others.

¶ 36       Garrett also testified that she was aware of respondent's monthly drug tests at MedMark, noting that she received reports from March 2024 through September 2024 showing monthly clean drops. She explained, however, that MedMark was not an approved provider for substance abuse services.

¶ 37    Garrett testified that she did not re-refer respondent for parenting classes or increase visits because respondent did not "progress in service engagement."

¶ 38    On cross-examination by the GAL, Garrett provided further testimony about MedMark. She explained that she told respondent that her agency did not accept the test results from MedMark. Garrett stated that respondent told her she was "continuing to receive the Methadone from MedMark until she established her services at Family Guidance Center." However, respondent attended only the assessment and never followed up.

¶ 39    Garrett also stated that she asked respondent to provide pay stubs for employment verification "more than once," which Garrett never received.

¶ 40    On redirect by the State, Garrett testified that the MedMark drug tests were scheduled to occur at the monthly appointments when respondent received her methadone. Garrett (and her agency) did not consider those drug tests to be reliable, and respondent was aware of that fact.

¶ 41                    c. The Trial Court's Findings

¶ 42    The trial court found that the State had proved by clear and convincing evidence each of the allegations of parental unfitness in the petition.

¶ 43    The trial court summarized its findings, noting that L.S. was taken into care because respondent was arrested with drugs and one of her children present. In January 2024, she tested positive for fentanyl, heroin, methamphetamine, amphetamine, and methadone. She had an assessment in March 2024 and (1) tested positive for opiates, amphetamine, methamphetamine, and methadone and (2) "despite being on methadone," she was recommended for outpatient treatment. The court noted that methadone was "clearly not working" to treat respondent's addiction because she was testing positive for "serious illegal controlled substances" while on

methadone.

¶ 44       Respondent had a second assessment in October 2024 and was scheduled to return the following week to "get her treatment plan," but she failed to appear. She told her caseworker she was going to stay on the methadone from MedMark until she transferred to Family Guidance Center, but she never did that. Despite her clean drops at her scheduled monthly methadone appointments, the only truly random drop she ever did was in January 2024, when she tested positive for multiple illegal drugs. The trial court remarked as follows:

> "[I]t's not surprising to me that she knows when her scheduled appointments are for MedMark, she knows she can't get her methadone unless she's testing clean. So, she shows up clean for those tests. There are no random drops through the life of this case after January of '24 for her to verify to the court, to her caseworker, to anyone that she's remaining substance free."

The court observed that she missed 33 drops, which the court characterized as "33 opportunities to show us that she was clean, and she said no."

¶ 45       The trial court acknowledged that respondent attended visits but noted that those visits never progressed past being supervised. Although she attended a couple of counseling appointments, the "counselor left, and then no information that [respondent] ever went back." Additionally, although respondent attended parenting classes, she "never went back for the test," so the court had "no idea whether or not she would have tested out as low risk, average risk, [or] high risk." The court also noted that respondent said she had a job, but she never provided proof of employment.

¶ 46       The trial court summarized, "So, she says a lot. She doesn't really accomplish much of anything. She certainly never accomplished satisfactory completion of substance abuse

treatment." For those reasons, the court found respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to L.S.'s welfare, (2) failed to make reasonable efforts to correct the conditions which were the basis for L.S.'s removal from her care, and (3) failed to make reasonable progress toward the return of L.S. to her care, as alleged in the petition.

¶ 47                              2. *The Best Interest Proceedings*

¶ 48         Immediately following the conclusion of the fitness portion of the termination proceedings, the trial court conducted the best interest portion of the termination proceedings. At the State's request, the court took judicial notice of the "prior testimony and evidence."

¶ 49                                    a. Garrett

¶ 50         The State again called Garrett, who testified that L.S. was seven years old and had been living in a "fictive kin" foster home since December 2023, or approximately one year and four months. L.S. lived in the home with his foster mother and father, his older sibling, and another unrelated toddler, who was also a foster child. L.S.'s oldest sibling often visited the home "for over nights and weekends." She also testified that L.S.'s foster parents wished to adopt him and were open to L.S. having continued contact with L.S.'s mother and father in the future.

¶ 51         Garrett testified that L.S. was attached to his foster parents, explaining that he "seeks them out for attention or just interaction with toys and needing help with homework and comfort." Garrett said L.S. calls his foster parents by their first names when he talks to them but calls them "mom and dad" when talking to others. Neither Garrett nor L.S.'s foster mother had asked L.S. about his wishes.

¶ 52         L.S. had an individualized education plan for "speech and language services" and

had a diagnosis of dyslexia, for which he was receiving services, but he had "no outstanding specialized medical care." Garrett said L.S.'s foster parents were involved in his speech and language services with him. Garrett testified that L.S.'s foster parents were providing for all his educational and medical needs.

¶ 53      On cross-examination by respondent's attorney, Garrett testified that L.S. was first placed with a paternal uncle, who attempted suicide while L.S. and his siblings were in his home; L.S. was removed from that home and placed in counseling following that event. She also testified that his current foster parents were in their early twenties and disagreed with respondent's attorney's assertion that they were too young to adopt.

¶ 54      Garrett also testified that, although she had not observed any of the visits between L.S. and respondent, she had reviewed the case aid reports and believed L.S. was bonded with his mother. She said they displayed love toward each other and L.S. appeared comfortable with her.

¶ 55                                    b. Respondent

¶ 56      Respondent testified that she had a "good" bond with L.S. She stated that during visits, he "asks all the time when he gets to come home." She stated that he is excited to see her at visits and "runs and gives me a hug." Respondent believed she could meet his medical, educational, and religious needs. She acknowledged the care that L.S.'s foster parents had provided but believed they could not care for L.S. like she could because "he's my son." Respondent stated, "Nobody is going to be able to take care of him and love him like I can." She also testified that, although the fitness portion of the proceeding was over, if she had more time to do services, she would do everything asked of her.

¶ 57                              c. The Trial Court's Findings

¶ 58    The trial court, after considering each of the statutory best interest factors, found that it was in L.S.'s best interest that respondent's parental rights be terminated. The court found that L.S.'s foster parents were providing for his physical safety and welfare, as well as his developmental and educational needs. L.S. was comfortable and secure in their home. Although respondent visited with L.S. two hours a week at the agency and those visits went "really well," the visits never progressed to longer, unsupervised visits in the home. As a result, the court was not able to determine whether L.S. would have any stability with respondent for longer than two hours.

¶ 59    Regarding the minor's wishes and long-term goals, the court stated that it would be "inappropriate" to ask a seven-year-old whether he wanted to go home with his parents or stay with his foster parents. The court believed that would confuse him and place him in a "horrible spot," noting that L.S. had an established relationship with respondent, but she had not addressed her issues.

¶ 60    The trial court placed great weight on (1) "the child's need for permanence" and (2) "the risks with being in substitute care." The court observed that "to be a foster child means this child doesn't know what is going to be his future," emphasizing that L.S. was still visiting with his parents but was waking up every day with his foster parents, who were taking care of his daily needs. The court found that L.S. was in "limbo" and "needs to know who's going to be there for him every day." The court was unwilling to give respondent more time to complete services because the court had no idea (1) how long it would take or (2) whether she would be successful. Because L.S. needed permanence and the court was "nowhere close to placing [L.S.] in the home with [respondent]," the court terminated respondent's parental rights.

¶ 61    This appeal followed.

¶ 62                                    II. ANALYSIS

¶ 63          Respondent appeals, arguing that the trial court's (1) fitness and (2) best interest determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 64                            A. The Fitness Determination

¶ 65          Respondent argues the trial court's finding that she was unfit was against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11. Based on our review of the record, we conclude that the court's finding that respondent failed to make reasonable progress toward the return of L.S. to her care was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 66                    1. *The Applicable Law and the Standard of Review*

¶ 67          The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28. Section 1(D)(m)(ii) of the Adoption Act defines an unfit parent as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2024). Reasonable progress is an objective view of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51. Additionally, the Illinois Supreme Court has held "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans." *In re C.N.*, 196 Ill. 2d 181, 216 (2001). Reasonable progress exists when the trial court can conclude that in the near future, it

- 13 -

will be able to order the children returned to parental custody. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 51.

¶ 68        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21. Accordingly, a trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 69                                              2. *This Case*

¶ 70        The evidence in this case supports the trial court's finding that respondent failed to make reasonable progress toward the return of L.S. during the nine-month period alleged in the motion for termination of parental rights (December 27, 2023, through September 27, 2024). Respondent did not successfully complete any of the services that were required of her.

¶ 71        Although respondent completed a substance abuse assessment, she never engaged in outpatient treatment. She elected to continue receiving methadone through MedMark despite knowing that (1) MedMark was not an approved agency and (2) Family Guidance Center would continue providing her methadone as part of her treatment there. Respondent completed a second assessment at Family Guidance Center and was scheduled to return the following week to receive her treatment plan, but she did not show up.

¶ 72        Respondent completed one drug test in January 2024 that was positive for multiple illegal drugs. To the extent she submitted to monthly drug tests through MedMark that were negative for illegal substances, Garrett explained that they were not randomly scheduled like the agency's tests were, and respondent knew she would only receive her monthly methadone if she tested clean at her scheduled appointment. We wholeheartedly agree with the

trial court's characterization of the agency's requests for 33 random drops as opportunities to demonstrate her sobriety, which she ignored.

¶ 73    Respondent's own choices not to engage with Family Guidance Center and not to attend random drug tests prevented the agency and the trial court from measuring any progress toward correcting her serious substance abuse issues, which were the primary reason L.S. came into care.

¶ 74    Additionally, respondent did not make any meaningful progress in mental health counseling, having attended only a "couple" of sessions, and she did not take the parenting exam. Respondent reported employment but did not provide pay stubs for verification. Although respondent participated in visits, due to her lack of progress in services, those visits never advanced beyond two hours of weekly supervised visits at the agency. Importantly, Garrett testified that at no point was she close to returning L.S. to respondent's care.

¶ 75    For the foregoing reasons, we affirm the trial court's finding that respondent was unfit because she failed to make reasonable progress.

¶ 76                    B. The Best Interest Determination

¶ 77                    1. *The Applicable Law and Standard of Review*

¶ 78    At the best interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. In reaching a best interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties;

- 15 -

(4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32.

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 79　　　A reviewing court affords great deference to a trial court's best interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 80　　　　　　　　　　　　　2. *This Case*

¶ 81　　　The evidence in this case also supports the trial court's finding that it was in L.S.'s best interest to terminate respondent's parental rights. L.S. was five years old when he was taken into care and was clearly bonded to respondent, with whom he enjoyed his visits. We believe, like the trial court did, that respondent loves L.S. and *wants* to provide for him, but she has demonstrated an inability to provide him with the stability and care that he needs. The court correctly observed that, even if respondent were given more time to complete services, based upon the 18 months she was already given, it is completely unknown whether she would actually engage

in services, let alone be successful.

¶ 82        In the meantime, L.S. has developed a bond with his foster family, who have provided for his daily, developmental, medical, and educational needs for 18 months and wish to provide him permanency through adoption. His foster parents have expressed a willingness to nurture his relationships with his two siblings, one of whom lives in the same foster home, and to allow continued contact with respondent.

¶ 83        The trial court considered each statutory best interest factor and gave great weight to L.S.'s need for permanence. We agree and conclude that the trial court's finding that termination was in L.S.'s best interest was well supported by the record.

¶ 84                                III. CONCLUSION

¶ 85        For the reasons stated, we affirm the trial court's judgment.

¶ 86        Affirmed.